# UNITED STATED DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

BELL INDEPENDENT POWER CORP.,

                      Plaintiff,                  DECISION & ORDER

      -vs-                                10-CV-6057-CJS

OWENS-ILLINOIS, INC.,
OWENS-BROCKWAY GLASS
CONTAINER, INC.,

                      Defendants.

_____

## APPEARANCES

For Plaintiff:                       James A. Hobbs, Esq.
                                    James Scott Wolford, Esq.
                                    The Wolford Law Firm, LLP
                                    600 Reynolds Arcade Building
                                    16 East Main Street
                                    Rochester, NY 14614
                                    (585) 325-8000

For Defendants:                Michael A. Oropallo, Esq.
                                    Hiscock & Barclay, LLP
                                    One Park Place
                                    300 South State Street
                                    Syracuse, NY 13221
                                    (315) 425-2831

## INTRODUCTION

**Siragusa, J.** Bell Independent Power Corp. ("Plaintiff" or "Bell Independent") originally brought this action against Defendants Owens-Illinois ("Owens-Illinois") and Owens Brockway Glass Container Inc. (collectively, "Defendants") in New York State Supreme Court, Monroe County, seeking damages alleged to arise out of common law claims for breach of contract, *quantum meruit*, and unjust enrichment. ECF No. 1. This

case was removed to this Court by Defendants on February 1, 2010.

Currently pending before the Court is Defendants' motion for summary judgment, ECF No. 29, seeking dismissal of the Plaintiff's complaint.[1] For the reasons that follow, Defendants' motion for summary judgment is granted, and the complaint is dismissed.

## BACKGROUND[2]

### *Energy Savings Proposals*

Defendants operate a glass container manufacturing operation located in Auburn New York. Plaintiff is a New York company started by Joseph Bell in 2005 with the objectives of developing alternative energy sources and technology, and assisting companies with significant power needs, such as Owens-Illinois.

Sometime in 2005, Plaintiff approached Defendants with several ideas for energy savings at Defendants' Auburn plant, and subsequently visited the premises and prepared for Defendants a proposal to recapture heat loss during glass-making operations. Ultimately, the proposal was not pursued by either party after it was determined that it would not be cost-effective.

Plaintiff then suggested that it could obtain energy rate reductions for the Defendants' Auburn plant and persuaded Defendants' representatives to attend a meeting in Albany, New York, in February, 2006, to explore a rate reduction for its electric costs with the New York State Public Service Commission ("PSC").[3] Defendants signed a letter prepared by Plaintiff dated December 7, 2005, concerning electric energy rate reduction,

---

[1] Defendants' motion does not ask the Court for judgment on their counter-claim for breach of contract.

[2] The following facts are undisputed unless otherwise noted.

[3] The electric rate reduction is also referred to herein by the parties as a "flex rate."

and provided terms for compensation to Plaintiff ("the Letter Agreement").

A second meeting in Albany, New York, took place on April 26, 2006, and former Owens-Illinois President of North American Operations, Matthew Longthorne ("Longthorne"), attended this meeting.[4] The Commissioner of the New York PSC, who was also in attendance at the Albany meeting, advised the parties that obtaining the electric rate reduction might not be feasible, so Defendants proceeded to hire an attorney to present a petition to the PSC seeking a reduced rate. Defendants and Plaintiff continued to work together on the rate reduction from April to sometime in late-2006, during which Defendants paid the cost of a lobbyist and an attorney in connection with the petition to the PSC. However, when Plaintiff learned that the petition was likely to be denied, it advised Defendants to withdraw it.

### Economic Development Grant Applications

According to Plaintiff, immediately after the Albany meeting with the PSC Commissioner, Longthorne directed Plaintiff to pursue any available savings for the Auburn plant, including grants,[5] in addition to the energy rate reductions. Walter Dep. at 71, 111-12; Bell Dep. at 54-55. Plaintiff maintains that Longthorne agreed that Plaintiff would be compensated for *all* savings obtained for Auburn in the manner provided by the December, 2005 Letter Agreement. *Id.* Longthorne, though, denies any recollection of what occurred during those discussions, and further denies that he agreed to compensating Plaintiff with respect to the grants. Longthorne Dep. at 33, 46-47. Gerard Walter ("Walter") of Bell Independent testified that he began the process of applying for grants for Defendants

---

[4] Longthorne left the employ of Owens-Illinois in April, 2007.

[5] The economic development grants were intended to offset repair costs incurred by Defendants to rebuild their furnaces at the Auburn plant.

immediately after the April 26, 2006, meeting in Albany. He further testified that the basis for the twenty-five percent commission "was an agreement by Matthew Longthorne at the April 26th meeting," but that the issue of compensation was never reduced to writing. Walter Decl. ¶¶ 9-11; Pl. Exs. 1-3; Walter Dep. at 71-72.

In April, 2006, Walter provided Defendants with a letter application for a grant from the Empire State Development Corporation ("ESDC"). Defendants signed the letter and sent it to ESDC on June 1, 2006. That month, Walter, Steven Gable ("Gabel") and David Daum ("Daum") of Owens-Illinois completed a supplemental worksheet required for the ESDC grant application. Gable directed Walter to complete the portions of the worksheet of which he had knowledge and then to return the worksheet to him to complete.

Although after April, 2006, Defendants paid the lobbying firm Bolton-St. Johns a monthly fee of $8,500.00 for services, they deny that such services were for the purpose of obtaining grants. Def. Reply Stmt. ¶ 44, ECF No. 41. However, Plaintiff asserts that the majority of the lobbying firm's work was, indeed, focused on obtaining grants. Pl. Stmt. ¶ 44, ECF No. 36. According to Plaintiff, Defendants were informed that after April, 2006, Bolton-St. Johns was working to pursue grants on their behalf. Pl. Exs. 10-12. Defendants, on the other hand, claim that the lobbyists' efforts were in connection with pursuing the electric rate reduction previously discussed by the parties. Def. Stmt. ¶ 45, ECF No. 31.

On June 21, 2006, in response to an inquiry from Plaintiff, Cayuga County emailed Plaintiff and Gable to inform them about the possibility of a grant up to $1 million for Owens-Illinois. In July, 2006, Walter, of Bell Independent, was directed by Defendants to work with Daum, of Owens-Illinois, on the Cayuga County grant application.

In July, 2006, ESDC offered Defendants a $650,000.00 grant. Shortly thereafter, Walter contacted Samanthia Rousos ("Rousos"), Global Sourcing Energy Manager for Owens-Illinois, and stated his intention to request additional funds from the ESDC.

Subsequently, in August, 2006, Walter provided Rousos with a draft letter seeking grant funds from New York State Senator Michael F. Nozzolio ("Senator Nozzolio"), which Rousos reviewed and provided suggested corrections. In September, 2006, Walter was informed by Bolton-St. Johns that Senator Nozzolio's office had offered $250,000.00 in matching funds, and that a letter directly from Owens-Illinois would be required to finalize the transaction. Walter, in turn, sent an email to Rousos informing her of the need for a letter from Defendants to Senator Nozzolio. Attached to that email was a listing of Bolton-St. Johns' work on behalf of Owens-Illinois. Pl. Ex. 10. Defendants state that Owens-Illinois paid a fee to Bolton-St. Johns for the lobbying work, and that Plaintiff was not involved in the lobbying activity. Def. Reply Stmt. ¶ 41.

On September 21, 2006, Rousos directed Walter to have the letter to Senator Nozzolio drafted from her. Walter did so, emailing Rousos the draft letter and stating that Bolton-St. Johns had reviewed and approved the letter.

Defendants also provided Walter with the information he requested for the purpose of completing an application for a grant from New York State Electric and Gas ("NYSEG"). Ultimately, NYSEG offered Defendants a grant of $750,000.00.

In November of 2006, ESDC increased its grant offer to Defendants to $1,250,000.00. Rousos later asked Walter to contact ESDC to determine whether some of the terms of its offer could be clarified or changed. In an email to Gabel of Owens-Illinois and other Owens-Illinois employees, Rousos stated that, after speaking with Walter, she

believed that Defendants should sign the ESDC grant offer. In the same email, Rousos recommended that "a project coordinator work closely with [Gabel] and Jerry Walter for reimbursement," and further stated, "[p]lease advise requirements for being able to receive the $750,000 grant from NYSEG also." Pl. Ex. 20. Defendants specifically deny that any agreement was reached or discussed for services related to the grants by anyone at Owens-Illinois. Def. Reply Stmt. ¶ 51.

On November 3, 2006, Joseph Bell emailed a "scorecard" to Longthorne and others at Owens-Illinois listing Plaintiff's progress on the grants it was pursuing, including the grants from ESDC, NYSEG, Senator Nozzolio, and Cayuga County.

The parties met again in Toledo, Ohio, in November and December of 2006 to discuss whether Defendants would invest the initial $20 million in capital costs to rebuild the furnaces at the Auburn plant.

In a letter dated November 15, 2006, Joseph Bell proposed to Longthorne that Defendants pay Plaintiff a fixed fee of $250,000.00 for its role in arranging economic development monies for Defendants, plus certain costs incurred by Plaintiff. In a December, 2006 email, Longthorne explained to Brian Flynn ("Flynn") at Bell Independent that he was opposed to Plaintiff's proposal:

> We are moving from a situation where Bell [Independent] was 100% at risk to deliver savings (in the form of a . . . flex rate) to a situation where [Owens-Illinois] is 100% at risk since if the savings never materialize, we pay all of your costs to work on it. What we talked about when you were in Toledo was that we would count economic development money as part of the savings as opposed to pure rate changes. I do not have an issue with that concept, but I am not of a mind to change the structure of the deal.

Pl. Ex. 24.

***Grant Approval and Claim for Compensation***

In 2006, ESDC offered Defendants a $1,250,000.00 grant, and in the same year NYSEG offered Defendants a $750,000.00 grant. Defendants contend that whether the grants were ultimately approved is not a material issue before the Court, nor is whether Plaintiff helped Defendants obtain those grants, because there exists no written agreement authorizing Plaintiff to do so.

Although Defendants claim that their relationship with Plaintiff ended after the meetings in Toledo, *see* Def. Stmt. ¶ 23, Plaintiff presents evidence that the parties continued to be in contact through at least May 2007 and possibly into the summer of the following year regarding the rebuilding of the furnaces. Walter Decl. ¶ 34; Flynn Dep. at 7, 65. In November, 2008, Plaintiff sent Defendants a letter and invoice in the amount of $500,000.00 for "services provided under enclosed agreement," attaching the December, 2005 Letter Agreement, which only referenced the energy rate reduction.[6] Def. Exs. K-L.

With regard to Plaintiff's November 15, 2008, request for payment, Defendants assert that they never agreed to compensate Plaintiff for the grant application services. Longthorne Dep. at 46. Plaintiff, however, provides deposition testimony from Bell Independent that states that an oral agreement existed between Plaintiff and Defendants. Walter Dep. at 71, 111-12; Bell Dep. at 48-49, 53-55, 60.

In November 2009, one year after its initial request for payment, Plaintiff sent Defendants a similarly-worded letter, again demanding compensation for the grants.

---

[6] The parties both state that the letter was sent in November, 2008. The Court notes that the letter is dated September 10, 2008, and the invoice is dated November 25, 2008. *See* Def. Exs. K & L.

The parties dispute whether an oral agreement was reached between Joseph Bell of Bell Independent and Longthorne of Owen-Illinois regarding the economic development grants during the April, 2006 meeting in Albany. Def. Stmt. ¶ 26; Pl. Stmt. ¶ 26. Plaintiff urges that, although nothing was reduced to writing to memorialize said agreement, Defendants' engagement of Plaintiff to pursue the grants is evidenced by numerous emails and the parties' "understanding that Bell IPC would be compensated." Pl. Stmt. ¶ 28; Pl. Exs. 1-11, 14-17, 19-22, 24. Defendants counter that Plaintiff, on several occasions, acted in a gratuitous manner in an effort to build a relationship with Defendants. Def. Reply Stmt. ¶ 58. Consequently, the crux of the parties' dispute before the Court is whether there existed an enforceable agreement for Plaintiff to be compensated for work performed towards securing grants on behalf of Plaintiff. For the reasons that follow, the Court finds that Plaintiff's claims fail as a matter of law.

## DISCUSSION

### *Summary Judgment Standard*

The standard for granting summary judgment is well-established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of

material fact. *See Amaker v. Foley*, 274 F.3d 677 (2d Cir. 2001). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993); *Anderson*, 477 U.S. at 248–49; *Doe v. Dep't of Pub. Safety*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Conn. Dept. of Public Safety v. Doe*, 538 U.S. 1 (2003); *International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in

admissible form is required. Fed.R.Civ.P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996).

### *Breach of Contract*

Defendants argue they are entitled to summary judgment on Plaintiff's breach of contract claim because there is no written agreement between the parties obligating Defendants to compensate Plaintiff for obtaining grants. In that regard, they cite to New York's statute of frauds, codified at N.Y. Gen. Oblig. Law § 5-701. *See* Def. Mem. at 9-20, ECF No. 32. That statute provides in pertinent part as follows:

> § 5-701. Agreements required to be in writing
>
> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: …
>
> 10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman.

N.Y. Gen. Oblig. Law § 5-701(a)(10). As the New York Court of Appeals observed about subdivision 10,

> [s]ince enactment of the statute, however, the scope of the term "business opportunity" has been differentially applied (*see, e.g., Lounsbury v Bethlehem Steel Corp.*, 53 Misc 2d 151, 152-156 [does not include contract

> to sell floating dry dock]; *National Performing Arts v Guettel* , 46 Misc 2d 411, 413-414 [includes contract to sell or lease packaged productions to theatre owners]; *Sorge v Nott*, 22 AD2d 768, *revg* 34 Misc 2d 545 [includes contract to procure purchaser of working interest in oil wells]; 1964 Report of NY Law Rev Comm, p 178, n 26). The scope is still to be fully resolved.

*Freedman*, 43 N.Y.2d at 266.

Courts have interpreted the phrase "negotiating . . . a business opportunity" as providing services "such as: (1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential business partners; (3) and being a 'major contributor' to the eventual formation of the [business opportunity]." *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010) (citing *Snyder v. Bronfman*, 13 N.Y.3d 504, 508–09 (2009)). The statute applies when a plaintiff's services provide "connections," "ability," "knowledge," "'know-how' or 'know-who,' in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise." *Freeman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 267 (1977). "Courts interpreting section (a)(10) have generally held that where the transaction results in the acquisition of an existing enterprise or the formation of a new one, it is a business opportunity." *Management Recruiters of Boulder v. Nat'l Econ. Research Assocs., Inc.*, No. 02 Civ. 3507 (BSJ), 2006 U.S. Dist. LEXIS 52076 (S.D.N.Y. July 24, 2006). In *Freedman*, the New York Court of Appeals determined that the plaintiff's "purported role was, concededly, limited and transitory." *Freedman*, 43 N.Y.2d at 267. It went on to state,

> He was not involved, nor was he supposed to be, in negotiation of the construction contract terms. He was to use his "connections", his "ability", and his "knowledge" to arrange for Chemical to meet "appropriate persons" and somehow to procure for it the opportunity to build the multimillion dollar plant. Yet, as observed earlier, it is just this kind of situation to which the statute is addressed.

*Id.*

Plaintiff concedes that there was no written agreement in place regarding its pursuit of economic development grants on behalf of Defendants, but argues that the statute is properly read to cover "services rendered . . . in negotiating *the purchase, sale, exchange, renting or leasing . . . of a business opportunity*, business, its goodwill, inventory, fixtures, or an interest therein," as opposed to "services rendered . . . in negotiating . . . a business opportunity." Pl. Mem., ECF No. 36, at 9-12. Stated another way, Plaintiff avers that the statute of frauds is inapplicable here because the transaction at issue did not involve the negotiation of the purchase or sale of a business opportunity. *Id.*

Plaintiff's interpretation ignores the vast line of cases that hold that the statute applies to preclude oral agreements concerning compensation for negotiating a business opportunity and the broad meaning that term has gained through judicial interpretation. *See Freedman*, 43 N.Y. 2d at 267; *Snyder*, 13 N.Y. 3d at 209 ("the question is simply whether plaintiff is now seeking compensation for services rendered in finding and negotiating a business opportunity."); *Antares Mgmt., LLC v. Galt Global Capital, Inc.*, No. 12–CV–6075, 2013 WL 1209799 (S.D.N.Y. Mar. 22, 2013) ("The provision of the statute of frauds upon which defendants rely applies to contracts 'to pay compensation for services rendered in negotiating . . . a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest.'") (quoting N.Y. Gen. Oblig. Law § 5-701(a)(10), alterations by the court); *Vaughan v. Ranger Ins. Co.*, No. 88 CV 0604, 1989 WL 1335 (E.D.N.Y. Jan. 5, 1989) (plaintiff's seeking finder's fee for introducing defendant to a general agent was "procuring an introduction to a party to the transaction" and thus constituted the negotiation of a business opportunity) (quoting N.Y.

Gen. Oblig. Law § 5-701(a)(10)). The Court finds that Plaintiff's role here was analogous to the plaintiff's role in the *Freedman* case. Plaintiff used his knowledge of contacts to allegedly procure business opportunities for Defendants in the form of economic development grants to rebuild their glass furnaces in Auburn.

Accordingly, the Court concludes that the subject matter of the agreement here—compensation for the procurement of grants to offset the costs of improvements made at a glass-making facility—is subject to N.Y. Gen. Oblig. Law § 5-701(a)(10) as negotiating a business opportunity. *See Belotz v. Jefferies & Co., Inc.*, 213 F.3d 625 (2d Cir. 2000) (obtaining a lender to provide bridge financing fell within scope of Section 5-701(a)(10))*; Zeising v. Kelly*, 152 F.Supp.2d 335 (S.D.N.Y. 2001) (formulating a financial and business plan, calling upon his contacts in the industry, and preparing and presenting the business plan to institutions to secure financing constituted negotiating a business opportunity); *Haskins v. Loeb, Rhoades & Co.*, 76 A.D.2d 751 (1st Dep't 1980) (obtaining financing for real estate development); *see generally Orderline Wholesale Distributors, Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F. Supp. 122, 128 (S.D.N.Y. 1987),("[T]he New York Court of Appeals held that 'negotiating a business opportunity' within the meaning of 5–701(a)(10) includes the use of "connections," "ability" and "knowledge" to facilitate or assist in the transaction by helping the acquirer of the business opportunity meet the right people and have the right information.") Significantly, Plaintiff characterizes its own activities as "advis[ing] [Defendants] regarding the requirements for obtaining grants," preparing the grant applications, and "contact[ing] the relevant decision makers to press for the grants." Pl. Mem. at 5-6. The nature of the agreement at issue here clearly falls within the parameters of N.Y. Gen. Oblig. Law § 5-701(a)(10), and, because it is

undisputed that no written agreement exists between the parties regarding the economic development grants, Defendants' motion for summary judgment is granted with respect to Plaintiff's claim for breach of contract.

### *Quantum Meruit*

Plaintiff alternatively seeks compensation under theories of *quantum meruit* and unjust enrichment. Compl. ¶ 23, ECF No. 1. Defendants respond that the statute of frauds cannot be overcome by Plaintiff's common law clams. Def. Mem. 20-21; Def. Reply Mem., ECF No. 40, at 6-9.

Subsection (a)(10) of New York's statute of frauds extends "to a contract implied in fact or in law." N.Y. Gen. Oblig. Law § 5-701(a)(10). The New York Court of Appeals has held that "[u]njust enrichment and *quantum meruit* are, in this context, essentially identical claims, and both are claims under 'a contract implied . . . in law to pay reasonable compensation,'" which will be barred by the statute of frauds where the compensation sought is for services rendered in negotiating a business opportunity. *Snyder*, 13 N.Y.3d at 508 (alterations in original); *see also Minichiello v. Royal Bus. Funds Corp.*, 18 N.Y.2d 521 (1966) (holding that the 1964 amendment to section 5–701(a)(10) clearly precludes any recovery in *quantum meruit*); *Prescient Acquisition Group, Inc. v. MJ Publ'g Trust*, No. 05 Civ. 6298, 2006 WL 2136293, at *5 (S.D.N.Y. 2006) ("In New York, a plaintiff may not assert an action under a theory of unjust enrichment in order to circumvent the writing requirement of the Statute of Frauds."); *Zeising*, 152 F. Supp. 2d at 345 ("In a breach of contract case, the requirement of a writing cannot be circumvented by an action for compensation in *quantum meruit*." (internal quotation omitted).

For purposes of a *quantum meruit* claim, the writing requirement of N.Y. Gen. Oblig. Law § 5-701(a)(10) may be satisfied where there exists a signed writing detailing all of the material terms except for compensation. *Koch v. Multipan, Inc.*, No. 99 CIV. 1277, 2001 WL 210004, at *5 (S.D.N.Y. Feb. 16, 2001); *Morris Cohon & Co. v Russell*, 23 N.Y.2d 569, 575-76 (1969) ("if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation of the defendant to pay reasonable compensation for the services is then implied.").

Relying on *Cohon*, Plaintiff argues that the writings contained in the present record are sufficient to remove the agreement from the statute of frauds and establish that Defendants engaged Plaintiff to pursue grants to subsidize the cost of rebuilding the furnaces at the Auburn plant. Pl. Mem. at 13-24. The relevant writings are detailed as follows.

### Email exchange April 28–June 1, 2006

On April 28, 2006, Walter, of Bell Independent, emailed Gabel, of Owens-Illinois, attaching a draft letter to Tony Kolinski of ESDC to begin the grant application process. Pl.'s Ex. 1. After one month without a response from Gable, Walter sent an email to Rousos on May 24, 2006, recommending that the approval of the draft letter be expedited. Rousos responded the following day, stating,

> I am also not entirely sure that the furnace rebuild is remaining tied to a lower flex power rate given the comments in your earlier email separating Empire State Development interests from PSC and NYSEG interests . . . . I don't doubt that PSC will continue to seek lower rates with NYSEG, but the distinction is that no longer looks to be connected with our furnace rebuild.

Pl. Ex. 4. On June 1, Gable sent an email to Walter advising that the grant application letter to ESDC had been mailed. *Id.*

### Email exchange, June 12-20, 2006

Between June 12 and June 20, 2006, Walter was in contact with Gable regarding completion of a "Project Information Worksheet" in order to obtain an estimate for the funding requested from ESDC. Gable asked Walter to "complete the information you know and forward back to me for completion[.]" Pl. Ex. 6. Walter complied, and received additional information and data for the worksheet from Daum at Owens-Illinois. Walter emailed the completed form to Gable and Daum with instructions to sign and send to Tony Kolinski of ESDC. Gable later responded that the worksheet had been sent to ESDC via overnight delivery. Pl. Exs. 6 & 14.

### Emails dated June 21, 2006 and July 15, 2006

The same month, Flynn, of Bell Independent, received an email from Cayuga County regarding a "small city grant" in regards to the furnace rebuilding project at Owens-Illinois. Therein, a representative from Cayuga County indicated the possibility of obtaining a $1 million grant. The email was copied to Gable. Pl. Ex. 21. With respect to the Cayuga County grant, Walter was instructed in an email by Gable to work with Daum in connection with the Cayuga County grant. Pl. Ex. 22.[7]

### Email exchange, July 20, 2006

On July 20, 2006, Walter emailed Rousos stating his intent to request additional funding from ESDC—above the $650,000 previously offered. Rousos responded, "[o]n a $/job basis, the other company is getting twice as much as we have been offered in funding for practically the same amount of investment." Pl. Ex. 7. In turn, Walter stated, "I had the same observation on the $/Job, that is why I think it is worth while to take another run at [ESDC] to increase funding." *Id.* Later that day, Walter emailed Rousos a copy of the letter

---

[7] No mention is made as to whether this grant was ultimately obtained.

he had sent to ESDC requesting additional financial support. *Id.*

**Email exchange, August 3–September 21, 2006**

Walter provided Rousos a draft letter requesting funding from Senator Nozzolio, to which she responded with some suggested edits to the letter. Walter revised the letter incorporating Rousos' comments, and sent the revised draft back to her. On September 21, Walter emailed Rousos informing her that Nozzolio's office would offer $250,000 in matching funds, but that a letter directly from Owens-Illinois would be necessary to formalize the offer. Later that day, Rousos emailed Walter thanking him for the follow-up, advising him to "have the letter drafted from me," and asked, "is this a grant?" Pl. Ex. 10. In the same email string, Walter discussed the role of Bolton-St. Johns and provided the list of lobbying activities performed by Bolton-St. Johns. At that time, Defendants paid Plaintiff for Bolton-St. Johns' lobbying efforts towards obtaining the grants. *Id.*

**Email exchange, October 31–November 3, 2006**

In October and November, 2006, Walter communicated with individuals at NYSEG and provided information about the Auburn plant and the furnace project. In doing so, Walter consulted by email with Lee Webber of Owens-Illinois, who provided certain additional information that Walter requested. Pl. Exs. 13-15. On November 2, 2006, NYSEG informed Walter that it would be offering Defendants a $750,000 grant to offset the costs of the furnace rebuilding project. Pl. Ex. 15. The following day, Joseph Bell emailed Longthorne a "scorecard" for the Auburn plant project, reflecting the NYSEG offer, and noting Bolton-St. Johns' involvement with respect to the ESDC grant. Pl. Ex. 16.

### Writings dated November 14 and December 6-7, 2006

In a letter addressed to Steve Gable of Owens-Illinois, ESDC offered Defendants a state incentive of $1.25 million on November 14, 2006. Pl. Ex. 18. In December, 2006, Rousos emailed Walter and requested that he contact ESDC to determine whether some of the terms of its offer could be clarified or changed. Walter replied that he would follow-up on the issues mentioned by Rousos. Pl. Ex. 19. The following day, Rousos emailed her colleagues at Owens-Illinois, copying Walter, stating that she believed Owens-Illinois should sign the ESDC grant offer, that a project coordinator should work with Gabel and Walter for reimbursement, and requesting that Walter provide the requirements to receive a $750,000 grant from NYSEG. Pl. Ex. 20.

### Analysis of Relevant Case Law

Plaintiff relies heavily on *Morris Cohon & Co. v Russell*, and its progeny for the proposition that New York's statute of frauds imposes a lower threshold for *quantum meruit* claims:

> In an action in *quantum meruit* . . . for the reasonable value of brokerage services, if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation of the defendant to pay reasonable compensation for the services is then implied.

*Cohon*, 23 N.Y.2d at 575-76. The *Cohon* court found that a written memorandum, though silent as to compensation, was sufficient to support a claim for *quantum meruit* where: it identified the buyer; identified the defendant as one of the sellers; established the fact of plaintiff's employment; identified plaintiff as a broker; established the subject matter of the transaction; and it acknowledged performance by the plaintiff in bringing about the sale of the defendant's stock. *Id.* at 576. Thus, a *quantum meruit* claim can survive where there

is a written document, signed by the party to be charged, detailing all of the material terms except for compensation. *Koch,* 2001 WL 210004, at *5.

*Cohon*'s holding has been read to permit *quantum meruit* claims to proceed even if the writing relied upon does not reflect all material terms of the parties' agreement, "so long as the writing evidences the defendant's engagement of the plaintiff's services in connection with a transaction that was later brought to fruition." *Springwell Corp. v. Falcon Drilling Co., Inc.*, 16 F.Supp.2d 300, 305, 314 (S.D.N.Y. 1998) (noting that "courts have, at a minimum, required the writing relied upon to establish clearly the existence of the alleged . . . agreement and its subject matter."); *see also Shapiro v. Dictaphone Corp.*, 66 A.D.2d 882, 885 (2nd Dep't 1978) (to sustain a *quantum meruit* claim, "[t]he writings need not evidence an actual intention to pay. It is sufficient if the evidence demonstrates that services were requested and the parties reasonably expected that such services were not to be performed gratuitously."); *Perfect Trading Co., Inc. v. Goldman, Sachs & Co.,* 236 A.D.2d 221, 222 (N.Y. App. Div. 1st Dep't 1997) (dismissing contract claim, but permitting *quantum meruit* claim, where writings "did not provide the material terms of the contract related to the compensation and duration," but reflected defendants' acceptance of and benefit from the plaintiff's services).

Even under a liberal reading of the *Cohon* rule, Plaintiff's evidence fails to constitute a viable claim for *quantum meruit* because here there is no acknowledgment of an offer, nor is there any indication that Defendants agreed to pay Plaintiff for its effort in pursuing the grant money.

The cases cited by Plaintiff are inapposite, as all of those contained a writing signed by the party to be charged containing at least some material terms and referencing an agreement. *See Shapiro,* 66 A.D.2d at 884 (denying summary judgment where defendant: (1) was informed in writing that plaintiff expected payment in the event a deal was consummated; (2) purportedly urged plaintiff repeatedly to perform services as a broker, while assuring him the specifics would be agreed upon at some later date; (3) acknowledged that such services were performed in a written letter) (citations omitted); *Trueforge Global Mach. Corp. v. Viraj Group,* 84 A.D.3d 938 (N.Y. App. Div. 2nd Dep't 2011) (holding that "certain e-mail correspondence . . . was sufficient to set forth an objective standard for determining the compensation to be paid to the plaintiff as a finder's fee, since it was tied to an extrinsic event, *i.e.*, it was expressed as a percentage of the price paid by the defendants for the located acquisition opportunity, thus rendering the terms definite and enforceable.") (citations omitted); *Perfect Trading Co. v Goldman, Sachs & Co.*, 236 A.D.2d 221 (1st Dep't 1997) (oral agreement reduced to writing referencing an obligation to pay finder's fee but without terms of compensation and duration); *Davis & Mamber v Adrienne Vittadini, Inc.*, 212 A.D.2d 424, (1st Dep't 1995) (signed letter from defendant authorizing plaintiff, a broker, to approach certain manufacturers); *Blye v. Colonial Corp. of Am.*, 102 A.D.2d 297 (1st Dep't 1984) (signed writing by defendants referencing a specific agreement and stating that terms of compensation would be further negotiated). In the instant case, the only signed writing relates to the energy rate reduction and involved Matthew Longthorne.

Likewise, Plaintiff finds little support from *Springwell Corp v. Falcon Drilling Co.*, 16 F. Supp. 2d 300 (S.D.N.Y. 1998), in which the district court permitted a plaintiff's *quantum meruit* claim to proceed where there existed a letter from the defendant that specifically referenced the transaction at issue, the subject of a retainer or finder's fee, the plaintiff's services provided, and defendant's benefit from the arrangement. *Id.* at 316. In *Springwell*, the district court did not base its determination on the plaintiff's letter to the defendant that it expected compensation, as is the case here, but on a letter from the defendant not only acknowledging that compensation was appropriate, but also referencing all material terms of the agreement *except* for the amount of compensation to be paid. *Id.*

While the collective writings proffered by Plaintiff arguably reference a previous agreement, no reasonable set of inferences permits them to constitute an agreement in and of themselves. Critically absent from the emails are the terms of compensation, a request or acceptance by Defendants for Plaintiff to perform services, and any reference to or an agreement for said services. Only the subject matter, *i.e.*, the pursuit of cost-saving grant money, is detailed here. As stated earlier, the only signed document proffered by Plaintiff is the original Letter Agreement from December, 2005, which discussed terms of Plaintiff's involvement in securing an energy rate reduction on behalf of Defendants. Def. Ex. A.

Moreover, the written record suggests that Defendants were actually opposed to compensating Plaintiff for its efforts in pursuing the economic development grants. *See* Pl. Ex. 24 (December, 2006 email from Longthorne to Flynn, stating that he did not have an issue with the "concept", but expressed disapproval of changing the "structure of the deal"); Pl. Ex. 25 (December, 2006 email from Flynn to Longthorne, stating, "I understand now

how our proposal on the economic development fee is totally repulsive to you."); Def. Ex. J (Letter from Joseph Bell to Longthorne dated November 15, 2006, characterizing the Toledo meeting as "sobering"). Indeed, the only evidence proffered by Plaintiff indicating that its services were not performed gratuitously is a series of after-the-fact letters demanding payment for securing the grant monies. *See* Def. Ex. K (Letter from Walter to Edward C. White of Owens-Illinois dated September 10, 2008, referencing the 2005 Letter Agreement); Def. Ex. L (Invoice dated November 25, 2008); Def Ex. M (December 20, 2008 Letter from Plaintiff demanding payment on 11/25/2008 invoice). Simply put, these writings are insufficient to establish entitlement under a theory of *quantum meruit*.

Reading the original Letter Agreement and the numerous writings contained in the record in the light most favorable to Plaintiff, the Court finds summary judgment for Defendants appropriate because taken together or separately, none of the writings establish that Defendants agreed to retain Plaintiff for the purpose of pursuing economic development grants. This is, unquestionably, a case where a writing could have easily been obtained—as evidenced by Plaintiff's initial efforts to engage Defendants in the December, 2005 Letter Agreement. *See, e.g.*, *Freedman*, 43 N.Y.2d at 267 ("The alleged agreement, therefore, was for services rendered in negotiating a business opportunity, and, in the absence of a writing, so easily obtained in a proper case, is unenforceable.")

In sum, Plaintiff's proffered writings fail to "establish clearly the existence of the alleged . . . agreement and its subject matter," *Springwell Corp.*, 16 F.Supp.2d at 305, and thus Defendants' motion for summary judgment is granted with respect to Plaintiff's claims for *quantum meruit* and unjust enrichment.

**CONCLUSION**

For all of the foregoing reasons, the Court grants summary judgment to Defendants, ECF No. 29, with respect to Plaintiff's claims concerning the rate reduction issue. The Court does not address, in this decision, the counterclaims raised by Defendants' in their answer to Plaintiff's complaint, nor the counterclaims raised by Plaintiff in its reply to Defendants' answer.

SO ORDERED.

Dated:   May 22, 2013
          Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge